# IN THE SUPREME COURT OF IOWA

No. 09–1745

Filed May 27, 2011

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Appellee,

vs.

**RICHARD J. MURPHY,**

Appellant.

On appeal from the report of the Grievance Commission of the Supreme Court of Iowa.

Appeal from Grievance Commission report in disciplinary proceeding recommending that attorney be publicly reprimanded. **LICENSE SUSPENDED.**

David L. Brown and Jay D. Grimes of Hansen, McClintock & Riley, Des Moines, for appellant.

Charles L. Harrington and Elizabeth E. Quinlan, Des Moines, for appellee.

**CADY, Chief Justice.**

This appeal comes from a report of a division of the Grievance Commission of the Supreme Court of Iowa. *See* Iowa Ct. R. 35.10. The Iowa Supreme Court Attorney Disciplinary Board alleged Richard J. Murphy violated ethical rules when representing his wife in her capacity as conservator and guardian and in representing the seller and buyer in the sale of the ward's home.

The grievance commission found Murphy violated the Iowa Code of Professional Responsibility for Lawyers and recommended he be publicly reprimanded. Upon our review, we find Murphy committed several serious ethical violations and suspend him from the practice of law for a period of eighteen months.

## I. Background Facts and Proceedings.

Richard J. Murphy was admitted to practice law in Iowa in 1964. He moved to Osceola with his wife, Patricia, and began his practice. Murphy and Patricia raised three children, including Thomas Murphy, who now practices law with Murphy. Murphy primarily practices in the areas of real estate, probate, and tax. On occasions, Patricia worked as a secretary in Murphy's law office. During his forty-five-year career, Murphy has been active in civic groups such as Rotary Club and the Jaycees. He has never been disciplined.

Murphy served as the Clarke County Attorney at the beginning of his career. While serving in this capacity, Murphy became acquainted with Helen Doss, who was the Clarke County Auditor. Murphy eventually became Doss's personal attorney and periodically performed various legal services for her. Murphy's family, including Patricia, became personal friends with Doss. Doss was widowed with no children,

and it became well known in the community that Doss, over time, relied on Patricia to assist her with her needs.

At some point, Doss also began to include Patricia and Murphy in her financial planning. In 1992, she named Murphy as the beneficiary of her life insurance policy. She also named Patricia as a co-owner of an account she maintained at Great Western Bank. Murphy assisted in the transaction by driving Doss to the bank where she signed documents to establish the joint ownership. Doss also named Murphy as a joint owner of a certificate of deposit she maintained at Union Planters Bank.

In late July 2000, Murphy prepared and filed a voluntary petition for appointment of a guardian and conservator for Doss. Doss was ninety-two years old at the time and had fallen several times in her home. Consequently, Doss agreed to move from her home into an extended care unit at the county hospital. After Doss moved into the care unit, she began to exhibit signs of dementia. Doss acknowledged in the petition for appointment of guardian and conservatorship that she was "unable to care for [her] personal safety or to . . . provide for [her] necessities . . . and [was] unable to make, communicate, or carry out important decisions concerning [her] financial affairs."

The district court entered an order appointing Patricia as the guardian and conservator of Doss. Murphy was designated as the attorney for Patricia.

After the conservatorship and guardianship was opened, Doss continued to include the Murphys in her estate planning. This was generally done by continuing to make Patricia a joint owner of her financial accounts and by making gifts to Patricia and Murphy.

In February 2001, Doss directed Brenton Bank by written correspondence to remove the name of a relative as co-owner of two

certificates of deposit maintained at the bank and to substitute Patricia as co-owner. Murphy had a telephone conversation with a person at the bank the day before Doss signed the letter requesting the change.

Two days later, Doss signed a letter addressed to Patricia directing her to sell the E-bonds she owned and to reinvest the proceeds in interest-bearing accounts payable to Patricia upon her death. As before, this letter was prepared for Doss to sign. Murphy then referred Patricia to a representative of A.G. Edwards & Sons, Inc. The E-bonds were redeemed for $125,840.71 and the proceeds were placed in an A.G. Edwards joint account with Patricia a short time later. Patricia paid the taxes on the transactions with the funds from another bank account held by Doss.

During this same time period, Murphy prepared a testamentary will for Doss. It was signed by her on March 5, 2001, and designated Patricia as the executor. This will left the bulk of her property to her nieces and nephews. Murphy had prepared a living will for Doss in 1988 and a testamentary will for Doss in 1991. In August 2000, just after Doss was admitted to the extended care unit, Murphy prepared a codicil to the 1991 will, substituting Patricia as the executor under the will.

Doss also maintained two bank accounts with Clarke County State Bank. Once the conservatorship and guardianship was established, Murphy only considered one of the two accounts at Clarke County State Bank to be an account of the conservatorship, and he only disclosed the activities of that account in the annual conservatorship report. Murphy considered the second account to be the personal account of Doss and did not disclose the account activities in the annual conservatorship report. Doss and Patricia wrote checks drawn on the undisclosed account for a variety of reasons, including cash gifts to Patricia, Murphy,

Care Center employees, and Doss. On one occasion, the account funds were used to purchase a vacuum cleaner for the Murphys at a cost of $1427.96. Checks from the account were often made payable to Murphy and Patricia in increments of $500 or $1000.

Murphy filed annual conservatorship reports with the court during the period of the conservatorship proceedings, but failed to disclose any of the transactions involving the transfer of property to Patricia or himself. In addition to failing to disclose the account activities in one of the two accounts with Clarke County State Bank, Murphy failed to disclose the joint ownership of the A.G. Edwards account. He reported the sale of the E-bonds, but did not disclose that his wife became a co-owner of the proceeds. Similarly, Murphy did not reveal Patricia as the substitute co-owner of the CDs at Brenton Bank. Likewise, Murphy failed to disclose in the annual reports filed with the court that Patricia was a joint owner on the accounts maintained with Great Western Bank and Union Planters Bank. He never sought court approval before transferring property or making gifts.

In 2002, Doss sold her residence. Murphy's son and law partner, Thomas, provided legal services to the buyer of the home by examining the abstract and preparing a title opinion of the buyer. Murphy provided the legal services and advice to Patricia in the real estate transaction. On appeal, Murphy asserts he was unaware his son provided legal services to the buyer.

Doss died on September 18, 2004. She was ninety-six years old at the time. Her last will and testament was the will signed on March 5, 2001. It made a single specific bequest to St. Jude's Hospital for $10,000 and left the remainder of the estate to her nieces and nephews in equal shares. Murphy filed a petition to probate the will. The court

appointed Patricia executor, and Murphy was designated as the attorney for the executor. There were five nieces and nephews who would share in the estate, including Harley D. Reed.

Murphy made a claim for benefits under the life insurance policy in October 2004. He was surprised to learn he had been designated as a beneficiary.

In November 2004, Murphy sent the beneficiaries a copy of the will, but failed to include the second page showing Patricia had been designated as the executor. In March 2005, Murphy filed the required report and inventory of the estate with the district court. The total value of the estate was $667,783.36. The schedule of joint tenancy property listed Patricia as a joint tenant of numerous accounts totaling approximately $240,000. Murphy was listed as a joint tenant of the Union Trust Bank account valued at approximately $36,000. The report and inventory failed to identify the life insurance policy naming Murphy as the beneficiary.

Reed subsequently contacted Murphy about the estate and the probate proceedings. He requested a copy of the report and inventory from Murphy. Murphy eventually responded by providing him a copy of the report and inventory, but failed to include the schedules of the report identifying the amount of the gross estate and property held in joint tenancy. Reed eventually learned of the gross value of the estate from the clerk of court.

Once Reed discovered the extent of the property that was subject to co-ownership by the Murphys, the residual beneficiaries contacted an attorney to investigate the matter. Following lengthy negotiations, the Murphys and the beneficiaries entered into a settlement agreement. The agreement required the Murphys to restore specific funds to the estate.

The board eventually filed a complaint against Murphy alleging unethical conduct. The board claimed Murphy's conduct in the Doss estate matter violated Iowa Code of Professional Responsibility for Lawyers DR 1–102(A)(1) (prohibiting a lawyer from violating a disciplinary rule); DR 1–102(A)(3) (prohibiting a lawyer from engaging in illegal conduct involving moral turpitude); DR 1–102(A)(4) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); DR 1–102(A)(5) (prohibiting a lawyer from engaging in conduct prejudicial to the administration of justice); DR 1–102(A)(6) (prohibiting a lawyer from engaging in any other conduct that adversely reflects on the fitness to practice law); DR 5–101(A) (prohibiting a lawyer from accepting employment if the exercise of the lawyer's professional judgment may be affected by the lawyer's own financial, business, property, or personal interest without full disclosure to and consent of the client); DR 5–101(C) (prohibiting a lawyer or a lawyer's partners or associates from preparing an instrument in which a client desires to name the lawyer beneficially); DR 5–105(B) (requiring a lawyer to decline proffered employment if the exercise of independent professional judgment on behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment); DR 5–105(C) (prohibiting a lawyer from continuing multiple employment if the exercise of independent professional judgment on behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment); DR 5–105(E) (requiring a partner, association or law firm of a lawyer who must decline or withdraw from employment to also decline or withdraw from employment); and DR 6–101(A)(3) (prohibiting a lawyer from neglecting a client's matter).

In general, Murphy's response to the board's complaint was that he followed the instructions of Doss when taking any action with regard to her property. He explained that any gifts from Doss to him or Patricia arose from Doss's generous nature and close relationship with them. Murphy denied any undue influence over Doss and described her as a strong-willed woman with an independent mind, especially with regard to her finances.

A hearing was held before the grievance commission. The commission found Murphy violated four disciplinary rules. It found he violated DR 1–102(A)(1) (prohibiting the violation of a disciplinary rule), DR 1–102(A)(5) (prohibiting conduct prejudicial to the administration of justice), DR 1–102(A)(6) (prohibiting conduct that adversely reflects on the practice of law), and DR 5–105(B) (declining employment when independent professional judgment on behalf of a client will likely be adversely affected). Violations under the first three rules were based on findings by the commission that Murphy failed to comply with several provisions of the code in representing Patricia in the conservatorship. These provisions governed self-dealing, gifting, transferring property, and accounting for assets. The commission not only found Murphy violated these provisions, but that he also violated the probate code in representing Patricia in her capacity as executor by failing to disclose during the probation proceedings the beneficial interest he held in the life insurance policy. Finally, the commission found Murphy violated DR 5–105(B) because he should have declined to represent Patricia due to the personal benefit the two individuals derived from the conservatorship.

The commission found the board failed to establish Murphy engaged in conduct involving moral turpitude, dishonesty,

misrepresentation, or deceit. It also found the board failed to establish Murphy prepared an instrument that named him beneficiary and that he neglected a client matter. Finally, the commission found the board failed to establish that Murphy impermissibly continued to represent Patricia in the real estate transaction after their son prepared a title opinion for the buyer.

The commission recommended that Murphy receive a public reprimand. The commission declined to impose a more severe recommendation due to Murphy's lengthy career, lack of prior disciplinary action, and the imposition of a settlement agreement with the residual beneficiaries. The commission also concluded the matter constituted a one-time lapse of judgment.

## II.  Standard of Review.

"We review attorney disciplinary proceedings de novo." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Wagner*, 768 N.W.2d 279, 281 (Iowa 2009). We give the commission's findings and recommendations respectful consideration, but are not bound by them. *Id.* at 282. The board has the burden of proving attorney misconduct by a convincing preponderance of the evidence. *Id.* at 281. Upon proof of misconduct, the court may impose a lesser or greater sanction than recommended by the commission. *Id.* at 282.

## III.  Discussion of Violations.

Guardianships and conservatorships exist to help needy minors and adults with impaired decision-making capacity in caring for themselves or their financial affairs. *See* Iowa Code § 633.552(2)(*a*)–(*b*) (2011) (describing the categories to support the guardianship); *id.* § 633.566(2)(*a*)–(*b*) (describing the categories to support the conservatorship). When this need is adjudicated, the court appoints a

person to serve as a guardian or conservator to provide the essential assistance. *See id.* § 633.3(7), (20). A guardianship primarily deals with the needs of people who are unable to care for their own safety or provide for the basic necessities of life, while a conservatorship primarily oversees and controls financial needs and matters. 14 Julie L. Pulkrabek & Gary J. Schmit, *Iowa Practice: Probate* § 36:1, at 881 (2010).

After a conservatorship is established, the law authorizes the conservator to take possession of all the property of the ward. Iowa Code § 633.640. Correspondingly, the law imposes a duty on the conservator to protect, preserve, and account for the property, and to perform all other legal duties required by law. *Id.* § 633.641. The ward has no general power to convey or dispose of property once a conservatorship is established unless authorized by the court. *Id.* § 633.637. Moreover, self-dealing by a conservator is specifically prohibited except by court order. *Id.* § 633.155. A conservator may make gifts on behalf of a ward from assets of the conservatorship, but only when authorized by the court under special circumstances. *Id.* § 633.668. The conservator is required to file annual reports with the court that include an inventory of the property of the conservatorship. *Id.* § 633.670. The report must also account for all disbursements and activities concerning the condition of the conservatorship. *Id.* §§ 633.670–.671. Overall, the conservator serves the interest of the ward and the statutory protections exist to accomplish this goal. Generally, conservators are considered to be fiduciaries and are liable for a breach of their duties and responsibilities. *Id.* §§ 633.649 (recognizing conservators have powers of fiduciaries), 633.160 (making fiduciaries liable for breach of duty).

The legal duties and responsibilities imposed on conservators and guardians often require the services of an attorney to help navigate

through the maze of legal requirements. Although the conservator is the client of such an attorney, the attorney also normally advances the interests of the ward in representing the conservator. *See Estate of Leonard ex rel. Palmer v. Swift*, 656 N.W.2d 132, 146 (Iowa 2003) (noting the conservator generally intends the ward to be the beneficiary of the lawyer's services because "a conservator has a statutory duty to protect the estate of a ward"). Thus, an attorney representing a conservator may owe a duty to the ward as a third-party intended beneficiary to the contract between the conservator and the attorney. *Id.* This tripartite relationship underscores the important entrusted roles of attorneys in guardianships and conservatorships. In this role, attorneys are guided not only by the law, but also by their code of professional responsibility.

Murphy failed to follow numerous statutory provisions in representing Patricia, most notably in changing ownership of numerous financial accounts owned by Doss into joint accounts owned with Patricia. His actions allowed Patricia to become the sole owner of these accounts upon Doss's death. Murphy generally sought to minimize the culpability of his conduct by attributing it to Patricia and claiming his representation of her did not result in any personal gain to himself. He then minimized Patricia's conduct by arguing she resolved any improprieties by settling the claims made against her by the beneficiaries and by claiming the transfers of property to her were consistent with the wishes of the ward. Finally, Murphy sought to align his professional duties only to Patricia and claimed any statutory deficiencies in representing her were merely the result of oversights and inadvertence.

The positions taken by Murphy obscure the responsibilities imposed by law and ignores the obvious. After the conservatorship was established, Murphy actively assisted his wife in arranging the financial

affairs of Doss so that Patricia would become the sole owner of a substantial portion of her financial accounts upon Doss's death. Murphy and his wife also accepted cash gifts of thousands of dollars from Doss and even permitted her to purchase a vacuum cleaner for them that cost nearly $1500. All of these activities were strictly forbidden by the law without full disclosure and authorization by the court.

Murphy, of course, failed to disclose his actions to the court, and the evidence clearly supported a finding that he purposely did so to perpetrate a larger scheme to benefit himself and his wife. If Doss did intend to include the Murphys in her estate planning during the last years of her life, the law required Murphy to explain the transactions to the court and obtain court approval. Moreover, disclosure of this matter would have given the court the opportunity to appoint a guardian ad litem to fully and independently consider the interests of Doss, among other things. The law clearly defined the path Murphy was required to follow if Doss desired to transfer property to the Murphys. Instead, Murphy chose to hide his activities from the court and the legal beneficiaries of Doss's estate. This obscuration reveals the dishonesty at the core of Murphy's actions. In truth, the evidence presented at the hearing supports a finding that Murphy and Patricia systematically took advantage of their positions of trust and confidence. Instead of exercising this trust and confidence as demanded by the law and the ethics of the legal profession, Murphy secretly rearranged the financial affairs of an elderly, incompetent woman to benefit himself and his wife.

Murphy's conduct in transferring property to his wife's name and in permitting gifts to be made without disclosure to the court and authorization by the court violated DR 1–102(A)(3) (prohibiting a lawyer from engaging in illegal conduct involving moral turpitude), DR 1–

102(A)(5) (prohibiting a lawyer from engaging in conduct prejudicial to the administration of justice), and DR 1–102(A)(6) (prohibiting a lawyer from engaging in any other conduct that adversely reflects on the fitness to practice law). Moreover, the conduct violated DR 1–102(A)(4) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation). Murphy purposely engaged in acts of misrepresentation by failing to disclose the transactions in the annual reports and by failing to seek court authority to make gifts. His conduct showed a pattern consistent with deceit, which continued in the probation proceedings. Murphy was an experienced lawyer who knew his conduct was wrong, and he sought to keep it from the scrutiny of others, including the district court. No other honest assessment of the facts and circumstances can be drawn.

While Murphy's conduct was serious, he did not violate all of the disciplinary rules alleged by the board. He did not violate DR 1–102(A)(1), which prohibits a lawyer from violating a disciplinary rule. We have held that this rule does not serve as an additional allegation to another violation of a disciplinary rule. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Ackerman*, 786 N.W.2d 491, 496 n.3 (Iowa 2010).

Most of the other violations alleged by the board were based on conflicts of interest associated with Murphy's representation of Patricia after having represented Doss over the years and Murphy's acceptance of assets from Doss during the period of time he represented her. The board also argued that Doss actually became Murphy's client during a time when he was involved in representing Patricia as the conservator.

We conclude the evidence was insufficient to support a violation of these additional allegations asserted by the board. Instead, the overall thrust of the misconduct in this case went to Murphy's violations of the

statutes governing conservatorships and his misrepresentation and deceit. Nevertheless, Murphy did violate DR 5–105(C) when he and his firm represented both the buyer and the seller in the sale of the Doss home. The prohibition against representing multiple clients applies even if the interests are not antagonistic and no fraud, improper notice, or economic harm exists. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Wagner*, 599 N.W.2d 721, 726 (Iowa 1999).

### IV. Sanction.

We do not impose a standard sanction for a particular type of misconduct. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Schmidt*, 796 N.W.2d 33, 42 (Iowa 2011). While prior cases can be instructive, we determine an appropriate sanction based on particular circumstances in each case. *Id.* In tailoring this action to the particular circumstances in each case,

> "we consider the nature of the violations, the attorney's fitness to continue in the practice of law, the protection of society from those unfit to practice law, the need to uphold public confidence in the justice system, deterrence, maintenance of the reputation of the bar as a whole, and any aggravating or mitigating circumstances."

*Iowa Supreme Ct. Att'y Disciplinary Bd. v. Casey*, 761 N.W.2d 53, 61 (Iowa 2009) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Ireland*, 748 N.W.2d 498, 502 (Iowa 2008)).

We have imposed severe sanctions in the past for unprofessional conduct by an attorney who engages in self-dealing and deceit during the course of a guardianship and conservatorship. In *Iowa Supreme Court Board of Professional Ethics & Conduct v. Remer*, 646 N.W.2d 91, 96 (Iowa 2002), we suspended a lawyer for three years for engaging in self-dealing. We recognized the vulnerability of the relationship involved as guardian and conservator and the need to impose strong discipline to

deter others from violating the trust. *Id.* We also believed suspension was needed to maintain the integrity of the profession. *Id.*

The approach taken in *Remer* is consistent with other disciplinary cases involving misrepresentation and deceit. We have repeatedly said that conduct involving " '[d]ishonesty, deceit, and misrepresentation by a lawyer are abhorrent concepts to the legal profession, and can give rise to the full spectrum of sanctions, including revocation.' " *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Van Beek*, 757 N.W.2d 639, 643 (Iowa 2008) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Hall*, 728 N.W.2d 383, 387 (Iowa 2007)). In the end, the circumstances of each case drive the sanction in cases involving self-dealing and misrepresentation. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Allen*, 586 N.W.2d 383, 391 (Iowa 1998) (imposing a one-year suspension for conduct involving unauthorized gifts to attorney from conservatorship and conversion of funds); *see also Van Beek*, 757 N.W.2d at 643–44 (imposing a two-year suspension for misrepresenting authenticity of a will, collecting probate fee without court approval, and neglect).

We think the sanction in this case falls between the three-year suspension imposed in *Remer* and the one-year suspension imposed in *Allen*. In *Allen*, the attorney had a very close relationship with the ward, the unauthorized gifts were consistent with the intent of the ward, and the gifts were repaid. In this case, Murphy was very close to the ward, the ward had gifted and transferred property to Murphy and his wife prior to the conservatorship, and the relatives of Doss who were the beneficiaries under the will entered into a settlement agreement over the matter. In *Remer*, the attorney had a history of disciplinary action and expressed no remorse.

Considering all the particular circumstances of this case, including all mitigating and aggravating factors, we impose a suspension of not less than eighteen months. While Murphy has enjoyed a good reputation in the community over his long career, the actions in this case constituted calculated deceit and self-dealing. He violated the most basic tenets of lawyering and violated the trust demanded of Iowa lawyers as officers of the court.

**V. Conclusion.**

We suspend Murphy's license to practice law indefinitely with no possibility of reinstatement for a period of eighteen months from the filing of this opinion. The suspension imposed applies to all facets of the practice of law provided by Iowa Court Rule 35.12(3) and requires notification to clients as provided by Iowa Court Rule 35.22. The costs of this proceeding are taxed against Murphy pursuant to Iowa Court Rule 35.26(1).

**LICENSE SUSPENDED.**

All justices concur except Waterman, Mansfield, and Zager, JJ., who take no part.